KARLSTAD STATE BANK, Respondent,

v.

Louis A. FRITSCHE, et al., Appellants.

Louis A. FRITSCHE, et al., Appellants,

v.

KARLSTAD STATE BANK, Stuart Folland, Production Credit Association of Grand Forks, Respondents.

KARLSTAD STATE BANK, Respondent,

v.

NORTHWEST PINZGAUER BREEDERS, LTD., et al., Appellants.

No. C7–86–347.

Court of Appeals of Minnesota.

Aug. 26, 1986.

William A. Schlossman, Jr., Vogel, Brantner, Kelly, Knutson, Weir & Bye, Ltd., Fargo, N.D., for Karlstad State Bank.

Benjamin S. Houge, Brooklyn Center, for Louis A. Fritsche, and Northwest Pinzgauer Breeders, Ltd., et al.

Andrew Danielson, Minneapolis, for Stuart Folland.

Paula D. Osborn, W. Joseph Bruckner, Oppenheimer, Wolff, Foster, Shepard and Donnelly, St. Paul, for Production Credit Ass'n of Grand Forks.

Heard, considered and decided by RANDALL, P.J., and LANSING and HUSPENI, JJ.

## OPINION

LANSING, Judge.

Louis and Jeanette Fritsche appeal the trial court's grant of summary judgment to the respondents in this action for negligence and fraud in the financing of the Fritsches' cattle business. We affirm.

## FACTS

In 1974 Louis Fritsche, a veterinarian, and Jeanette Fritsche, a teacher, ventured into the business of breeding Pinzgauer cattle, an Austrian breed that is relatively rare in the United States. To finance acquisition of a herd and pay operating expenses, the Fritsches obtained loans from Karlstad State Bank. Stuart Folland was the bank's president and chief operating officer. Because the bank had a $70,000 lending limit, which was less than the amount the Fritsches needed, the bank sought participation of the Production Credit Association of Grand Forks in the loans to the Fritsches.

In 1975 the Fritsches needed additional capital and formed a limited partnership, Northwest Pinzgauer Breeders, Ltd. (NWPB), to raise it. The sole general partner was Minnesota Pinzgauer Enterprises, Inc. (MPE), a corporation owned completely by the Fritsches. An underwriting company offered 25 limited partnership units for sale at $20,000 each. The limited partnership, the bank and the underwriter entered into an impoundment agreement under which the bank would escrow all funds received from the sale of limited partnership units. The agreement provided the bank would return all deposited funds to the investors unless the bank received $200,000 in subscriptions and the partnership received a $240,000 term loan by December 31, 1976.

In December 1976 the Fritsches learned that insufficient partnership units had been sold. On the advice of counsel, they and the underwriter decided to purchase the unsold units in order to meet the terms of the impoundment agreement. The bank agreed to finance the acquisition of the unsold units.

On December 31, 1976, the Fritsches and the underwriter met with Stuart Folland in Thief River Falls, Minnesota, where Folland was vacationing. During this meeting, various notes and guarantees relating to a $240,000 term loan and a $230,000 working capital loan to NWPB were executed. The Fritsches personally guaranteed the corporation's obligations, and the corporation guaranteed the partnership loans.

Because the meeting with Folland took place away from the bank and after banking hours, no actual deposits were made. On January 3, 1977, Folland executed deposit slips dated December 31, 1976, under which the funds for the purchase of the units were deposited in the impoundment account. In January 1977 the PCA agreed to participate in the term and working capital loans.

In January 1979 a PCA auditor recommended that the bank obtain a direct guarantee from the Fritsches for the partnership debt. To satisfy the PCA's concerns, and as a condition of the 1979 loan renewal, the Fritsches signed a collection guarantee for NWPB's line of credit. The examiner also pointed out that NWPB was probably ineligible for PCA financing because it appeared to be a tax shelter. Sometime in March 1980 Folland provided the PCA with an inventory list that substantially overstated the number of cattle in the herd. In April 1980 the PCA refused to participate in any loans through the bank until the NWPB situation was "clarified."

In July 1980 the parties entered into an agreement which required the Fritsches to liquidate the herd. The herd was ultimately sold at public auction; gross receipts amounted to $325,000.

This case involves three lawsuits which were consolidated for trial. In the first action, the bank sued the Fritsches to foreclose on certain collateral pledged and to obtain a deficiency judgment. The Fritsches counterclaimed for fraud and negligence and alleged the foreclosure sale of their cattle was commercially unreasonable. In the second action, the Fritsches, MPE and NWPB sued the bank, Folland and the PCA for fraud and negligence. In the third action, the bank sued the Fritsches and their business entities, seeking to foreclose on other collateral that had been assigned to the bank as security and to obtain a deficiency judgment.

In December 1983 the parties reached a partial settlement of the bank's foreclosure actions. As part of that settlement, the Fritsches, MPE and NWPB agreed that they were jointly and severally liable to the bank for $1.2 million in principal and interest.

In June 1984 the trial court consolidated the fraud and negligence claims and ordered partial summary judgment in favor of the bank and the PCA. The parties then tried to the court the issue of whether the dispersion sale was commercially reasonable. The court concluded that the sale was commercially reasonable, and a deficiency judgment was entered against the Fritsches for the amount stipulated plus accrued interest. On appeal, this court affirmed the commercial reasonableness of the sale but did not address the award of summary judgment on the fraud and negligence claims because the order was not final until Stuart Folland's liability was adjudicated. *Karlstad State Bank v. Fritsche*, 374 N.W.2d 177, 184 (Minn.Ct. App.1985).

In February 1986 the trial court ordered summary judgment in favor of Stuart Folland. The Fritsches appeal from the judgment dismissing the claims of fraud and negligence against all parties.

## ISSUE

Did the trial court err in granting respondents summary judgment on the claims of fraud and negligence?

## ANALYSIS

The Fritsches contend the following factual allegations support their claims of negligence, misrepresentation and fraudulent concealment:

1. The PCA issued the term loan despite the fact that Farm Credit Act provisions and regulations prohibit loans to tax shelter operations.

2. The PCA did not tell the Fritsches that the loan to them was allegedly "illegal."

3. The bank and Stuart Folland prepared fictitious deposit slips and used the bank's endorsement stamp to show checks or deposit slips dated December 31, 1976, and January 26, 1977, as having been paid or deposited in the bank on December 30, 1976.

4. The bank, through Folland, made written fraudulent representations about the number of cattle in the herd which were "relied upon by the PCA or others to make decisions concerning the extension of credit, request for collateral, disposition of loan funds, forebearance from collection of debt and other matters directly affecting Plaintiffs."

5. The bank and Folland did not disclose these fraudulent representations to the Fritsches.

In their answers to interrogatories, the Fritsches assert they were damaged in several ways as a consequence of the alleged fraudulent and negligent acts. First, they argue that the bank's fraud resulted in their liability to the limited partners for over $800,000 in connection with a securities case pending in federal court.[1] Second, they claim that, absent any fraud, they would not have received the loans, would have liquidated their business earlier, and would not have been responsible for such substantial debts. Finally, they claim that they were induced to sign a guarantee

making them personally liable for all claims against NWPB.

The tort of fraud consists of a false representation of a past or present material fact which was susceptible of knowledge, a defendant who knew the representation was false or made it without knowing whether it was true or false, and an intention to induce plaintiff to act in reliance on the misrepresentation and resulting damages. *Davis v. Re-Trac Manufacturing Corp.*, 276 Minn. 116, 117, 149 N.W.2d 37, 38–39 (1967) (quoting *Hanson v. Ford Motor Co.*, 278 F.2d 586, 591 (8th Cir.1960)). The concealment of a material fact can also constitute fraud. *See Peterson v. Arellano*, 289 Minn. 541, 185 N.W.2d 282 (1971). In either fraud or negligence, damages must be caused by the tortious act. *Davis v. Re-Trac*, 276 Minn. at 117, 149 N.W.2d at 39.

We agree with the trial court that the Fritsches have not stated any material facts which would allow them to recover in fraud or negligence.

The misrepresentations in the deposit slips and the cattle inventory by Stuart Folland were undisputedly made to third parties; the Fritsches did not rely on them to their detriment. In addition, the Fritsches' personal guarantee of the partnership loans in 1979, whether induced by fraud or not, caused them no harm. In 1976 the Fritsches personally guaranteed MPE's obligations for "all other indebtedness and liabilities of whatsoever nature, due or about to become due * * * whether as maker, endorser, *guarantor* or otherwise * * *" (emphasis added). MPE guaranteed the partnership loans. By these two 1976 guarantees, the Fritsches were already guarantors of NWPB's debts. The 1979 guarantee did not create any broader liability.

Similarly, the Fritsches' claims for failure to disclose material facts, whether

---

1. Whether the Fritsches will incur losses as a result of a pending lawsuit is a matter of speculation. In any event, none of the pleadings in the federal case are included in this record. Therefore, we cannot determine the validity of

the Fritsches' claim that they have been injured by the lawsuit or, if they are in fact liable, whether their liability is connected with the alleged tortious conduct of the bank, Stuart Folland or the PCA.

framed in tort or negligence, must fail on a critical element. Banks do not owe a special duty to counsel customers about a transaction unless special circumstances have created a fiduciary relationship. *Klein v. First Edina National Bank*, 293 Minn. 418, 422, 196 N.W.2d 619, 623 (1972). The PCA had no direct contacts with the Fritsches and did not have a fiduciary relationship with them.

Even assuming that the Karlstad State Bank became a fiduciary through Folland's actions, there is no connection between any breach of the fiduciary relationship through nondisclosure and the Fritsches' damages. The bank presumably loaned money to the Fritsches to make a profit from the interest derived, not to imperil the bank's own money. *See Stenberg v. Northwestern National Bank of Rochester*, 307 Minn. 487, 488, 238 N.W.2d 218, 219 (1976). The cause of the Fritsches' present liabilities was their inability to develop a business that could keep up with its debt obligations.

## DECISION

The trial court did not err in entering summary judgment in favor of the bank, the PCA and Stuart Folland. There are no genuine issues as to any material fact, and the respondents were entitled to prevail as a matter of law.

Affirmed.